# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| JAMES L. RATCLIFF, ET AL., | Case No. 20-CV-834 (NEB) |
| Appellants, | |
| v. | ORDER ON MOTION FOR STAY PENDING APPEAL AND MOTION FOR CONSOLIDATION AND ACCELERATION OF APPEALS |
| RANCHER'S LEGACY MEAT CO., ET AL., | |
| Appellees. | |
| JAMES L RATCLIFF, ET AL., | Case No. 20-CV-835 (NEB) |
| Appellants, | |
| v. | |
| RANCHER'S LEGACY MEAT CO., ET AL., | |
| Appellees. | |
| JAMES L RATCLIFF, | Case No. 20-CV-1343 (NEB) |
| Appellant, | |
| v. | |
| RANCHER'S LEGACY MEAT CO., ET AL., | |
| Appellees. | |

1

These motions arise out of a dispute over whether the sale of substantially all of the assets of a chapter 11 debtor, Rancher's Legacy Meat Co. ("RLM"), should be halted so long as no final decision has issued as to whether its largest unsecured creditor, James L. Ratcliff, has a secured or unsecured interest in its assets. For the reasons stated below, this Court concludes that Ratcliff met his burden to show that the sale should be halted while he seeks to reverse his unsecured status on appeal and grants Ratcliff's motion to stay pending appeal so long as he posts a *supersedeas* bond. It grants his request to consolidate his appeals and denies his request to expedite his appeals.

## BACKGROUND

### I.     Ratcliff Lends to RLM's Predecessor-In-Interest and Obtains a Security Interest in Its Assets

The Court draws the following background from the bankruptcy court's recitation of the undisputed facts. (*See generally In re Rancher's Legacy Meat Co.*, Case No. 19-32928 (Bankr. D. Minn.) (the "Bankruptcy Case"), ECF No. 165; *Rancher's Legacy Meat Co. et al. v. James L. Ratcliff et al.* (In re Rancher's Legacy Meat Co.), Adv. Pro. No. 19-03095 (Bankr. D. Minn.) (the "Adversary Proceeding"), ECF No. 31 (together, the "Lien Avoidance Orders").)

In 2010, Ratcliff and Joseph Unger started Unger Meat Company ("UMC"), a meat processing and packing company. (Lien Avoidance Orders at 3.) Ratcliff purchased the building to be used for UMC's processing plant and leased it to UMC. (*Id.*) He also lent UMC startup funds by way of two promissory notes. (*Id.*) Relatedly, he entered a security

agreement with UMC that gave him a security interest in certain (but not all) of UMC's assets. (*Id.*)

On December 29, 2010, Ratcliff filed a UCC-1 Financing Statement with the Minnesota Secretary of State to record the security interest granted by his agreement with UMC. (*Id.*) In 2014, UMC was sold. (*Id.*) In connection with that sale, SSJR, LLC purchased Ratcliff's shares in UMC. (Lien Avoidance Orders at 3–4.) On May 6, 2014, UMC's articles of incorporation were amended to change its name to "Rancher's Legacy Meat Co." (*Id.* at 4.) On November 12, 2015, Ratcliff filed a UCC-3 continuation statement, but did not change the name of the debtor. (Lien Avoidance Orders at 4.) On January 10, 2019, Ratcliff filed a UCC-3 amendment to his financing statement, providing "Rancher's Legacy Meat Co." as the name of the debtor. (*Id.*) On September 20, 2019, RLM filed a voluntary petition to commence Chapter 11 bankruptcy proceedings. (*Id.*)

## II.    Ratcliff's Three Appeals from Bankruptcy Court

Ratcliff contends that he has a perfected security interest in RLM's assets. He thus sought adequate protection in bankruptcy court, arguing that as a secured creditor he is entitled to monthly protection payments to protect him from the depreciation of his purported collateral while it is in RLM's possession. (Bankruptcy Case, ECF No. 124 at 2–3.) In the alternative, he sought relief from the automatic stay to pursue his remedies in state court. (*Id.* at 3.)

RLM and the Official Committee of Unsecured Creditors of Rancher's Legacy Meat Co. (the "Committee") disagree that Ratcliff has a perfected security interest in RLM's assets. Even before Ratcliff filed his motion in bankruptcy court, RLM and the Committee initiated an adversary proceeding against Ratcliff. (Adversary Proceeding, ECF No. 1.)[1] Among other things, they sought to avoid Ratcliff's liens over RLM's assets under sections 544, 550 and 551 of the Bankruptcy Code and to disallow Ratcliff's claim under sections 502(b) and (d) of the Bankruptcy Code. (*See generally*, *id.*) In the Adversary Proceeding, RLM and the Committee moved for partial summary judgment against Ratcliff, arguing that any security interest Ratcliff had in RLM's assets had "lapsed"[2] under applicable Minnesota law. (*See* Adversary Proceeding, ECF No. 27 at 3.) Thus, RLM and the Committee argued that they were entitled to a judgment declaring that Ratcliff does not have a perfected lien in RLM's assets. (*See, e.g.*, Adversary Proceeding, ECF No. 27 at 3.) In response to Ratcliff's motion, RLM and the Committee objected, again arguing that Ratcliff's lien was unperfected and avoidable by RLM. (*See generally* Bankruptcy Case, ECF Nos. 136, 137.)

In an order dated March 23, 2020, the bankruptcy court granted RLM and the Committee's motion for partial summary judgment and denied Ratcliff's motion seeking

---

[1] The Court notes that Great Western Bank is also a defendant in those proceedings. (*See* Adversary Proceeding, ECF No. 1.)

[2] As the Court explains in this opinion, the term "lapse" has led to some confusion in this case. The Court uses it here only to describe the arguments made by RLM and the Committee.

adequate protection or, in the alternative, relief from the automatic stay. (*See* Lien Avoidance Orders at 25–26).) It ruled that, under applicable Minnesota law, Ratcliff's lien became unperfected and his security interest had "lapsed" prior to the commencement of RLM's chapter 11 proceedings. (*See* Lien Avoidance Orders at 13–17.) Thus, the bankruptcy court ruled that Ratcliff is an unsecured creditor. (*Id.* at 20.) It entered a judgment avoiding Ratcliff's lien under section 544 and preserving it for the benefit of the estate under section 551 of the Bankruptcy Code. (Bankruptcy Case, ECF No. 167; Adversary Proceeding, ECF No. 32.) Ratcliff has since appealed the Lien Avoidance Orders and the related judgment. (*See James L. Ratcliff, et al. v. Rancher's Legacy Meat Co., et al.*, Case No. 20-CV-834 (D. Minn.), ECF No. 1; *James L. Ratcliff, et al. v. Rancher's Legacy Meat Co., et al.*, Case No. 20-CV-835 (D. Minn.), ECF No. 1.)

Meanwhile, continuing with its chapter 11 proceedings, RLM sought authorization to go forward with the sale of substantially all of its assets under section 363(b) of the Bankruptcy Code. (*See generally* Bankruptcy Case, ECF No. 215.) It proposed a sale process under which it would either sell substantially all of its assets to a stalking horse bidder or, if it received qualifying bids by June 23, to the bidder that prevailed at an auction held on July 1. (*See id.* at 4–8.) RLM asserted that credit bidding should not be permitted as part of the sales process. (*See id.* at 8.)

Shortly after RLM sought the authorization for sale, Ratcliff moved for a stay of the Lien Avoidance Orders as a means to stay the sale. Ratcliff argued to the bankruptcy

court that because he is a secured creditor, he has the right to credit bid at any sale of RLM's assets held under section 363. (Bankruptcy Case, ECF No. 222 at 3.) Ratcliff argued that "[t]he only way his rights can be preserved during the pendency of the appeal is for [the bankruptcy court] to stay its earlier rulings and halt any sales process until [his] rights can be determined." (*Id.*)

Ratcliff also argued that the bankruptcy court lacked jurisdiction to move forward with the sale because the sales process would moot his appeal of the Lien Avoidance Orders. (*See generally* Bankruptcy Case, ECF No. 227.) Under Ratcliff's argument, if he succeeds on appeal, he would be deemed a secured creditor, and he would have the statutory right to credit bid. (*Id.* at 5.) RLM and the Committee responded to Ratcliff's objection, contending that under section 363(k), "cause" exists to prohibit credit bidding independent of the issues implicated by Ratcliff's appeal of the Lien Avoidance Orders. (*See generally* Bankruptcy Case, ECF No. 230.)

At a hearing held on June 3, the bankruptcy court denied Ratcliff's motion to stay. (*See* Bankruptcy Case, ECF No. 236.) It also approved RLM's preliminary sale and bidding procedures motion. (ECF No. 237, the ("Sale Order").) In its Sale Order, the bankruptcy court also denied Ratcliff's oral motion for a stay of its effect. (*See id.* at 3.) Ratcliff has appealed that ruling as well. (*See James L. Ratcliff v. Rancher's Legacy Meat Co., et al.*, Case No. 20-CV-1343 (D. Minn.), ECF No. 1.)

### III.    Ratcliff's Motion for a Stay and the Consolidation and Acceleration of His Appeals

Since filing his appeal of the Sale Order, Ratcliff has filed an expedited motion for a stay of the Lien Avoidance Orders and the Sale Order with this Court, requesting "a stay of any proceeding in bankruptcy court that forbids Ratcliff from credit bidding his putative secured claim . . . ." (ECF No. 12 (the "Expedited Motion for Stay").)[3] He requests that this Court stay these rulings and any judgments made in connection with the Lien Avoidance Orders and the Sale Order "until such time as a final non-appealable order is issued by an appellate court." (ECF No. 14 ("Ratcliff Stay Mem.") at 8.) He has also filed an emergency motion for consolidation and acceleration of his three appeals. (ECF No. 22 (the "Emergency Motion for Consolidation and Acceleration").) These motions are at issue in this order.

## ANALYSIS

### I.      Subject-Matter Jurisdiction

#### A.      *The Bankruptcy Court's Jurisdiction*

A bankruptcy court's determinations of its own subject-matter jurisdiction are subject to *de novo* review.  *In re Nat'l Warranty Is. Risk Retention Grp.*, 384 F.3d 959, 962 (8th Cir. 2004).

---

[3] It appears Ratcliff as well as RLM and the Committee have filed papers relevant to the motions at issues here across all three dockets assigned to Ratcliff's appeals, that is, Case Nos. 20-CV-834, 20-CV-835, and 20-CV-1343 (D. Minn.). Rather than confuse readers with parallel cites across all three dockets, unless otherwise noted, the docket cites in this opinion that do not refer to the Bankruptcy Case or Adversary Proceeding cite to Case No. 20-CV-1343 (D. Minn.).

Ratcliff contends that the bankruptcy court lacked jurisdiction to issue the Sale Order because that order decided issues that are closely interwoven with the issues raised in his appeals of the Lien Avoidance Orders. For the reasons stated below, this Court disagrees and concludes that the bankruptcy court did not err when it issued the Sale Order over Ratcliff's jurisdictional objection.

As the Eighth Circuit has acknowledged, under the divestiture doctrine "[a]n appeal . . . only divests the bankruptcy court of its control over those aspects of the case involved in the appeal." *Sears v. Sears*, 863 F.3d 980, 984 (8th Cir. 2017) (cleaned up). "[T]he bankruptcy court loses jurisdiction only as to the questions raised and decided in the specific order appealed from; the bankruptcy court's jurisdiction over other matters relating to the case is not impaired." *Sears v. Sears*, 542 B.R. 463, 473 (D. Neb. 2015), *aff'd*, 863 F.3d 980 (8th Cir. 2017) (quoting 5B Fed. Proc. L.Ed. Bankruptcy § 9:1850). That is, while the appeal prevents the bankruptcy court from modifying or vacating the order on appeal, it does not prevent the bankruptcy court from enforcing the judgment. *See In re Alexander*, 236 B.R. 679, 682 (Bankr. D. Minn. 1999), *aff'd*, 239 B.R. 911 (B.A.P. 8th Cir. 1999), *aff'd*, 236 F.3d 431 (8th Cir. 2001); *see also, e.g., In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 680 (Bankr. S.D.N.Y. 2016) (rejecting argument that divestiture doctrine would be invoked if the bankruptcy court were to enforce aspects of its order).

The Court must thus determine whether the Sale Order alters or reconsiders issues decided in the Lien Avoidance Orders. In rejecting Ratcliff's jurisdictional arguments, the

bankruptcy court explained that "deciding a [section] 363(k) issue is not the same thing as taking an action to modify an order under appeal." (ECF No. 17-1 at 240.) It further explained that deciding whether cause exists under section 363(k) to prevent Ratcliff from credit bidding does nothing to determine his secured status and thus does not moot the issue of his secured status; it merely it makes it less financially desirable for Ratcliff to pursue his appeals. (*Id.*) It then found sufficient cause under section 363(k) to prohibit Ratcliff from credit bidding because there is a *bona fide* dispute as to whether Ratcliff is a secured creditor with the right to credit bid. (*Id.* at 243.) The bankruptcy court cited that rationale in denying Ratcliff's motion to stay the Lien Avoidance Orders, in denying Ratcliff's objection to the sale, and in denying Ratcliff's oral motion to stay the Sale Order. (*See* ECF No. 17-1 at 240, 243.) But to protect Ratcliff in the event he succeeds on his appeal of the Lien Avoidance Orders, it ordered that RLM (or its liquidating agent) hold sales proceeds in escrow and either "(i) establish a reserve prior to making any initial distributions to creditors in an amount sufficient to account for the possibility of Ratcliff's secured claim being reinstated on appeal, or (ii) delay distributions together until Ratcliff's appeal is decided by a final, non-appealable order." (Sale Order at 2.)

Although the Court affords no deference to the bankruptcy court's reasoning, it finds no fault in the bankruptcy court's conclusion that it had jurisdiction to issue the Sale Order. In determining that cause exists under section 363(k) to prevent Ratcliff from credit bidding, the bankruptcy court relied on persuasive authority that a *bona fide*

dispute over the validity of a creditor's lien constitutes cause to preclude that secured creditor from credit bidding his claim. (*See* ECF No. 17-1 at 240–241.)

Indeed, this Court's research confirms that generally, courts are wary of purported secured creditors' attempts to credit bid where the extent or validity of their liens is genuinely in dispute. To protect the estate and other creditors, bankruptcy courts may impose conditions on the credit bid to assess and account for the potential inequities that may result when the extent or validity of the disputed lien is reassessed after the sale. *See, e.g.*, *In re Octagon Roofing*, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991) (permitting creditor to credit bid so long as it posted an irrevocable letter of credit); *In re RML Dev., Inc.*, 528 B.R. 150, 155–57 (Bankr. W.D. Tenn. 2014) (permitting holder of allowed secured claim to credit bid but limiting right to offset to uncontested amount of claim and requiring funds exceeding that amount to be paid into escrow). Bankruptcy courts may also prohibit credit bidding entirely where the validity of the creditor's lien is genuinely in dispute. *See, e.g.*, *In re L.L. Murphrey Co.*, No. 12-03837-8-JRL, 2013 WL 2451368, at *5 (Bankr. E.D.N.C. June 6, 2013) (finding cause to deny creditor the right to credit bid under section 363(k) because the basis of its claim and the liens asserted on the debtor's property were disputed); *In re Akard St. Fuels, L.P.*, No. CIV.A.3:01-CV-1927-D, 2001 WL 1568332, at *3 (N.D. Tex. Dec. 4, 2001) (upholding bankruptcy court's determination that cause existed to prohibit purported secured creditor from credit bidding where the challenge to its liens constituted a *bona fide* dispute); *In re McMullan*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996),

*subsequently aff'd sub nom. McMullan v. Nat'l Bank of Commerce*, 162 F.3d 1164 (8th Cir. 1998) (table) (holding creditor would not be allowed to offset its bid by any of its claim lien or security interest in the debtor's assets "because the validity of its liens and security interests" under applicable state law remained unresolved).

Based on its review of the relevant orders and section 363(k) case law, the Court is convinced that to rule on the Sale Order, the bankruptcy court relied on the rationale that the *bona fide* dispute over the validity of Ratcliff's lien would likely require a lengthy period of time to reach a final resolution—to the detriment of the estate and RLM's other creditors. In so doing, the bankruptcy court did nothing to disturb, modify, or vacate the Lien Avoidance Orders; the court merely acknowledged that Ratcliff has appealed its determination that he is an unsecured creditor and that Ratcliff intends to pursue that appeal until his status is decided by a final, non-appealable order. If anything, the bankruptcy court enforced its determination that Ratcliff is an unsecured creditor and therefore has no right to credit bid. Because the bankruptcy court did not alter or reconsider issues decided in the Lien Avoidance Orders, the decisions it made in those orders remain intact for appellate review. Ratcliff's appeal of the Lien Avoidance Orders did not divest the bankruptcy court of jurisdiction to issue the Sale Order.

The Court is not persuaded by Ratcliff's arguments to the contrary. Ratcliff's central argument on the jurisdictional issue is that the Sale Order "moots" his appeals of the Lien Avoidance Orders because "the lower court's decision says that even if Ratcliff

wins his appeal and obtains the right to credit bid, he still cannot credit bid because [RLM] had previously asserted that he was not a secured creditor" and this renders his right to appeal illusory. (*See, e.g.*, Ratcliff Stay Mem. at 18–19.) This is not enough to invoke the divestiture doctrine. Ratcliff does not argue that any ruling made in connection with the Sale Order has any effect on the issues the bankruptcy court decided in the Lien Avoidance Orders. Nor does he argue that in deciding the Sale Order the bankruptcy court attempted to reconsider issues decided in the Lien Avoidance Orders. Rather, he complains that the bankruptcy court should wait to decide on RLM's sale and bidding procedures motion until a final, non-appealable order issues with respect to his status as a secured (or unsecured) creditor. But "bankruptcy courts are not divested of jurisdiction to decide issues and proceedings different from and collateral to those involved in the appeal." *In re Bd. of Directors of Hopewell Int'l Ins. Ltd.*, 258 B.R. 580, 583 (Bankr. S.D.N.Y. 2001). And "a bankruptcy court retains jurisdiction, while an appeal is pending and in the absence of a stay, to enforce the order or judgment appealed from." *Id.* That is what the bankruptcy court did here. Thus, Ratcliff's appeals of the Lien Avoidance Orders did not divest it of jurisdiction to issue the Sale Order.

## II.    Motion for Stay Pending Appeal

In his Expedited Motion for Stay, Ratcliff seeks a stay of the Lien Avoidance Orders, the Sale Order, and their related judgments under Rule 8007(a) of the Federal Rules of Bankruptcy Procedure. (*See* ECF No. 12.) District courts have jurisdiction to hear

appeals from bankruptcy courts as set forth in 28 U.S.C. § 158. And, as relevant here, Rule 8007(a) provides that "[o]rdinarily, a party must move first in bankruptcy court for the following relief . . . a stay of a judgment, order, or decree of the bankruptcy court pending appeal." Fed. R. P. 8007(a)(1). As noted above, Ratcliff first presented his requests to the bankruptcy court, and the bankruptcy court denied each of them.

"A party seeking a stay pending appeal must demonstrate that it is likely to succeed on the merits, that it will suffer irreparable injury unless the stay is granted, that no substantive harm will come to other interested parties, and that the stay will do no harm to the public interest." *In re Ross*, 223 B.R. 702, 703 (B.A.P. 8th Cir. 1998). The movant must prove each of these elements by a preponderance of the evidence. *See In re Wire Rope Corp. of Am., Inc.*, 302 B.R. 646, 648 (Bankr. W.D. Mo. 2003).

Ratcliff seeks a stay of the Lien Avoidance Orders and the Sale Order "until such time as a final non-appealable order is issued by an appellate court" on the issue of his status as a secured or unsecured creditor. (ECF No. 14 at 8.) He also requests an order suspending "any sales proceedings in the case that attempt to deny Ratcliff's rights to credit bid his $18,000,000 claim in the bankruptcy case before his rights as a secured creditor are determined upon appeal." (*Id.*) For the reasons stated below, this Court believes Ratcliff has met his burden to show that he is entitled to a stay of the Lien Avoidance Orders and the Sale Order.

A.    *Likelihood of Success on the Merits*

13

The linchpin of Ratcliff's argument for a stay is that the bankruptcy court erred when it determined that he is not a secured creditor and that he is not entitled to credit bid at the sale the bankruptcy court has authorized of substantially all of RLM's assets. Because the Lien Avoidance Orders determined that Ratcliff is an unsecured creditor and the Sale Order's conclusion that he is not entitled to credit bid rests on that determination, Ratcliff must make a strong showing that he is "likely" to succeed in reversing the bankruptcy court's Lien Avoidance Orders. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (describing the inquiry relevant to assess the first factor as "whether the stay applicant has made a strong showing that he is likely to succeed on the merits" (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 423 (8th Cir. 1996) (explaining that movants must establish "that they are 'likely' to succeed on the merits" to satisfy the first factor). He need not "establish an absolute certainty of success." *Id.* But "more than a mere possibility of relief is required." *Nken*, 556 U.S. at 434 (cleaned up). In ruling on Ratcliff's appeals of the Lien Avoidance Orders, the Court will review the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*. *In re Burival*, 613 F.3d 810, 811 (8th Cir. 2010). Because the Court concludes that Ratcliff is likely to succeed in his appeals of the Lien Avoidance Orders, this factor weighs in favor of granting Ratcliff's requested stay.

1.      *The Bankruptcy Court's Findings of Fact and Conclusions of Law*

In its Lien Avoidance Orders, the bankruptcy court made the following findings, which the parties do not dispute on appeal: (1) that in December 2010, Ratcliff filed a UCC-1 Financing Statement with the Minnesota Secretary of State to perfect interests a security agreement granted in the assets of UMC; (2) that in January 2011, Ratcliff filed a UCC-3 amendment to his 2010 financing statement; (3) that in May 2014, UMC's articles of incorporation were amended to change its name to "Rancher's Legacy Meat Co." following its sale;[4] (4) that in November 2015, Ratcliff filed a UCC-3 Continuation Statement listing the debtor company's name as "Unger Meat Company;" and (5) that in January 2019, Ratcliff filed a UCC-3 Amendment listing the debtor company as "Rancher's Legacy Meat Co." (Lien Avoidance Orders at 3–4.)

The security agreement Ratcliff entered with UMC contains the following paragraph:

> 1.  <u>Security Interest</u>. Debtor does hereby grant, bargain, sell, and convey unto Secured Party a purchase money security interest in and to all of Debtor's equipment, including but not limited to the equipment described on Exhibit "1" hereto, inventory, lease agreement, accounts receivable, furniture and fixtures, *whether now owned or hereafter acquired, together with all proceeds and products thereof and replacements therefore* . . . .

(Bankruptcy Case, ECF No. 124-1, Ex. C. ¶ 1 (emphasis added); *see also* Lien Avoidance Orders at 3.) The security agreement also contains a provision granting Ratcliff the right to file the documents necessary to perfect the security interest it granted him—that is, to

---

[4] Ratcliff does not dispute that he was aware of this name change.

"re-perfect" in the event his interests became unperfected. (*See* Lien Avoidance Orders at

12 ("no one contests that Ratcliff had the right and ability to re-perfect his security interest

at any time"); *see also* Bankruptcy Case, ECF No. 124-1, Ex. C. ¶ 3(b).)

The bankruptcy court reviewed the UCC, as adopted by Minnesota, to conclude

that "under Minnesota law, once a security interest becomes unperfected, it is deemed to

have never been perfected." (Lien Avoidance Orders at 8 (analyzing Minn. Stat. § 336.9-

515).) It then determined that because Ratcliff did not correct RML's name on his 2010

UCC-1 Financing Statement in September 2014, "the 2010 UCC-1 Financing Statement he

filed in 2010 became ineffective" and "his interest lapsed." (Lien Avoidance Orders at 9.)

The court also concluded that Ratcliff's "subsequent filings referred back to a Financing

Statement that had lapsed and was no longer valid," and that "even if the Financing

Statement could somehow be considered valid, the subsequent filings did not follow the

requirements of the UCC and were ineffective." (Lien Avoidance Orders at 14.) It

determined that "[f]rom the moment Ratcliff's interests became unperfected, by

operation of law he became—and remained when [RML's] bankruptcy case was filed—

an unsecured creditor." (Lien Avoidance Orders at 20.)

As for the Sale Order, as noted above, the bankruptcy court's determination that

cause exists under section 363(k) to deny Ratcliff the opportunity to credit bid rested on

its earlier determination that Ratcliff is an unsecured creditor and, because Ratcliff has

appealed that conclusion, there is a *bona fide* dispute over the validity of Ratcliff's lien.

2.     *Relevant Bankruptcy Law and UCC Provisions*

Assessing whether Ratcliff has demonstrated a likelihood of success in his appeals of the Lien Avoidance Orders and the Sale Order requires this Court to consider relevant bankruptcy and non-bankruptcy law, including the UCC. In doing so, it must untangle the complicated legal web that governs security interests, priority, and the avoidance powers of a Chapter 11 debtor-in-possession.

a.     Security Interests

Minn. Stat. § 336.9-201(a) explains that "[e]xcept as otherwise provided in the Uniform Commercial Code, a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors." Minn. Stat. § 336.9-201(a). And Minn. Stat. § 336.9-203 provides that "[a] security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment." Minn. Stat. § 336.9-203(a). It also sets forth conditions that must be satisfied for that security interest to be "enforceable against the debtor and third parties with respect to the collateral." Minn. Stat. § 336.9-203(b). Important here is that Minn. Stat. § 336.9-203 makes no mention of perfection. In short, "a security agreement is effective as between the debtor and a creditor even if not perfected." *In re Highland Constr. Mgmt. Servs.*, LP, 497 B.R. 829, 832

17

(Bankr. E.D. Va. 2013), *aff'd sub nom. In re Highland Const. Mgmt. Servs.*, LP, 583 F. App'x 217 (4th Cir. 2014) (citing UCC as adopted by Virginia).

    b.    <u>Priority</u>

        Though perfection is irrelevant to whether a secured creditor has an enforceable interest against the debtor, it is relevant to whether a secured creditor takes priority over encumbered assets with respect to other creditors. This is explained in other provisions of the UCC, including those governing the effects of perfection, failure to maintain perfection, and the lapse of a financing statement.

        For example, perfection is relevant to ascertaining priority between competing secured creditors, and as a general matter the secured creditor who is first in time to perfect his security interest takes priority over the others. *See generally* Minn. Stat. § 336.9-322; *see also In re Highland Constr. Mgmt. Servs.*, LP, 497 B.R. at 837 (analyzing UCC as adopted by Virginia). Perfection is also relevant to ascertaining whether a secured creditor's interest has priority over a judicial lien creditor. Minn. Stat. § 336.9-317(a) explains that "[a] security interest or agricultural lien is subordinate to the rights of . . . a person that becomes a lien creditor before . . . the security interest . . . is perfected." Minn. Stat. § 336.9-317(a). In other words, perfection provides "priority to a judicial lien creditor only if [that creditor] acquires its interest prior to perfection of the security interest." *In re Miller Bros. Lumber Co., Inc.*, No. 1:12CV720, 2013 WL 5755052, at *6 (M.D.N.C. Oct. 23, 2013) (analyzing UCC as adopted by North Carolina). That is, the holder of an

unperfected security interest is subordinate to a judicial lien creditor. *Accord id.* at *6 (applying UCC as adopted by North Carolina); *In re Highland Constr. Mgmt. Servs., LP*, 497 B.R. at 838 (applying UCC as adopted by Virginia). Thus, *when* the holder of an enforceable security interest perfects his interest determines whether he has priority over or is subordinate to competing secured creditors and judicial lien creditors.

And, as a general matter, the timing of the filing of a financing statement matters. As a general rule, "a financing statement must be filed to perfect all security interests." Minn. Stat. § 336.9-310(a). The date on which the holder of an enforceable security interest files a UCC-compliant financing statement is important to determine whether he is first in time to perfect his security interest. Sometimes, even though a secured creditor has filed a UCC-compliant financing statement and properly perfected his security interest, events after that filing limit the effectiveness of his financing statement in maintaining his perfection and therefore affect his priority with respect to certain other creditors. Two of those events are relevant to this Court's review of the Lien Avoidance Orders: (1) when a financing statement becomes "seriously misleading" within the meaning of Minn. Stat. § 336.9-506 because the debtor has changed its name; and (2) when a financing statement "lapses" within the meaning of Minn. Stat. § 336.9-515(c).

First, Minn. Stat. § 336.9-507(c) provides that if there has been a change in the debtor's name (making the financing statement "seriously misleading" under Minn. Stat. § 336.9-506), then:

(1) the financing statement is effective to perfect a security interest in collateral acquired by the debtor before, or within four months after, the filed financing statement becomes seriously misleading; and

(2) the financing statement is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the filed financing statement becomes seriously misleading, unless an amendment to the financing statement which renders the financing statement not seriously misleading is filed within four months after the financing statement became seriously misleading.

Minn. Stat. § 336.9-507(c).

Under these provisions, if Minn. Stat. § 336.9-507(c) is triggered and the creditor fails to file "an amendment to the financing statement which renders the financing statement not seriously misleading" within the four-month safe harbor provided by Minn. Stat. § 307(c)(2), then the financing statement is not rendered entirely ineffective to perfect his security interest. As Minn. Stat. § 336.9-507(c)(1) makes plain, "the financing statement is [still] effective to perfect a security interest in collateral acquired by the debtor before, or within four months after, the filed financing statement becomes seriously misleading." Minn. Stat. § 336.9-507(c)(1). The creditor only becomes unperfected with respect to assets acquired *more than four months after* the name change that made the financing statement seriously misleading in the first place. *See* Minn. Stat. § 336.9-507(c)(2); *see also, e.g., In re Lifestyle Home Furnishings, LLC,* No. 08-00629-TLM, 2010 WL 148644, at *4 (Bankr. D. Idaho Jan. 14, 2010) & n.7 (holding that by operation of the UCC, as adopted by Idaho, due to debtor's May 7, 2007 name change a secured

creditor became unperfected with respect to assets acquired on or after September 8, 2007).

In short, if the secured creditor fails to amend the name on his financing statement within the four-month safe harbor provided by Minn. Stat. § 307(c)(2), then he becomes unperfected in assets acquired four months after the name change. But he maintains his perfection in assets acquired before that date. And, of course, the fact that he has become unperfected in assets acquired more than four months after the name change has nothing to do with whether he has an enforceable security interest as against the debtor. It merely makes him vulnerable to other creditors who may take priority with respect to those assets.

Second, a "lapse" of the financing statement under Minn. Stat. § 336.9-515(c) may limits its effectiveness in maintaining a secured creditor's perfection. Ordinarily, a financing statement "is effective for a period of five years after the date of filing." Minn. Stat. § 336.9-515(a); *see also In re Miller Bros. Lumber Co., Inc.*, 2013 WL 5755052 at *1 (analyzing UCC as adopted by North Carolina). But the life of the financing statement may be extended for another five years by the timely filing of a UCC-compliant continuation statement. Minn. Stat. § 336.9-515(e); *see also In re Miller Bros. Lumber Co., Inc.*, 2013 WL 5755052 at *1. To be timely, a continuation statement must be filed within six months before the date that the financing statement is set to expire. Minn. Stat. § 336.9-515(d); *see also In re Miller Bros. Lumber Co., Inc.*, 2013 WL 5755052 at *1.

If the creditor does *not* file a UCC-compliant continuation statement to extend the life of his financing statement beyond five years, then the financing statement "lapses" within the meaning of Minn. Stat. § 336.9-515(c). *See* Minn. Stat. § 336.9-515(c), *see also In re Miller Bros. Lumber Co., Inc.*, 2013 WL 5755052, at *1; *see also, e.g., In re Colony Beach & Tennis Club, Inc.*, 508 B.R. 468, 475 (Bankr. M.D. Fla. 2014), *aff'd sub nom. Colony Lender, LLC v. Breakpointe, LLC,* No. 8:13-BK-00348-KRM, 2015 WL 3689075 (M.D. Fla. June 12, 2015) (noting financing statement that was not continued beyond its original five-year effectiveness lapsed under UCC as adopted by Florida); *In re Highland Constr. Mgmt. Servs., LP,* 497 B.R. at 831 (Bankr. E.D. Va. 2013) (noting that because debtor did not timely file a continuation statement his financing statement lapsed under UCC as adopted by Virginia).

Minn. Stat. § 336.9-515(c) provides:

> The effectiveness of a filed financing statement lapses on the expiration of the period of its effectiveness unless before the lapse a continuation statement is filed pursuant to subsection (d). Upon lapse, a financing statement ceases to be effective and any security interest or agricultural lien that was perfected by the financing statement becomes unperfected, unless the security interest is perfected otherwise. If the security interest or agricultural lien becomes unperfected upon lapse, it is deemed never to have been perfected as against a purchaser of the collateral for value.

Minn. Stat. § 336.9-515(c).

Courts analyzing the UCC as adopted by other states have explained the various effects of the lapse of a financing statement. While "[t]here is a seductive appeal to the notion that the lapse of a financing statement and the loss of perfection has the dire

consequence of extinguishing the lien," "[t]he lapse of a *financing statement* does not mean that the creditor's *security interest* is extinguished." *In re Colony Beach & Tennis Club, Inc.*, 508 B.R. at 478, 480. This makes sense; as noted, perfection has nothing to do with whether a creditor may enforce his security agreement against a debtor in accordance with their security agreement. Thus, lapse of a financing statement—the filing ordinarily used to perfect a security interest—affects the secured creditor's priority vis-à-vis other creditors. It does not affect whether he can enforce his security agreement against the debtor.

Also, lapse of a financing statement has different effects on the secured creditor's priority with respect to creditors who acquired their interests before the lapse and those who acquire their interests after the lapse. Courts navigating this difference have explained it as the distinction between the prospective and retroactive or retrospective effects of lapse. *See, e.g., id.* at 479 (noting that "[t]he first sentence . . . has a prospective effect . . . [and t]he second sentence has a retroactive effect"); *In re Highland Constr. Mgmt. Servs., LP*, 497 B.R. at 834–35 (describing the difference between "the retrospective rule" and "the prospective rule"). "Upon lapse, a financing statement ceases to be effective and any security interest or agricultural lien that was perfected by the financing statement becomes unperfected" with respect to creditors that acquire their interests subsequent to lapse. Minn. Stat. § 336.9-515(c). This is what courts refer to as the "prospective" effect of lapse. *See, e.g., In re Highland Constr. Mgmt. Servs., LP*, 497 B.R. at 834–35 ("The prospective rule is that once a financing statement lapses, the security interest becomes unperfected

as to all parties who obtain a lien subsequent to the lapse"); *In re Colony Beach & Tennis Club, Inc.*, 508 B.R. at 479 (explaining that "the prospective effect" of lapse is that "the financing statement, and thus perfection, ceases to be effective after the lapse").

But the effect of lapse on the secured creditor's priority with respect to creditors who acquired interests after the filing of the financing statement but before its lapse is very different. Minn. Stat. § 336.9-515(c) explains that "[i]f the security interest or agricultural lien becomes unperfected upon lapse, it is deemed never to have been perfected *as against a purchaser of the collateral for value*." Minn. Stat. § 336.9-515(c) (emphasis added). It says nothing of other creditors. The so-called retroactive effect of lapse is specifically that "the financing statement is deemed never to have been effective against a purchaser of the collateral for value." *In re Colony Beach & Tennis Club, Inc.*, 508 B.R. at 479. Courts have therefore determined that upon lapse, the financing statement is still effective to protect the secured creditor's priority vis-à-vis a judicial lien creditor who acquires his interest after the financing statement was filed but before it lapses. *See, e.g., id.* at 480; *In re Miller Bros. Lumber Co., Inc.*, 2013 WL 5755052, at *7; *In re Highland Constr. Mgmt. Servs.*, LP, 497 B.R. at 837 (noting "[l]ien creditors are not purchasers for value."). In short, upon lapse, a financing statement is still effective to perfect a secured creditor's interest with respect to certain creditors—such as lien creditors—who acquired their interests after the financing statement was filed but prior to its lapse. *See id.* at 838.

Under these principles, (1) if the financing statement becomes "seriously misleading" within the meaning of Minn. Stat. § 336.9-506 because the debtor has changed its name and (2) if the financing statement "lapses" within the meaning of Minn. Stat. § 336.9-515(c), then the financing statement becomes *limited* in its effectiveness in preserving a secured creditor's priority vis-à-vis other creditors. But neither event renders the financing statement entirely ineffective. If a financing statement becomes "seriously misleading" within the meaning of Minn. Stat. § 336.9-506 because of a name change and the creditor fails to correct the debtor's name on the financing statement in the four-month safe harbor, then the financing statement is still effective to preserve the secured creditor's priority with respect to assets acquired up to four months after the name change. That is, the secured creditor is perfected with respect to assets acquired up to four months after the name change and unperfected with respect to assets acquired four months after the name change. *See, e.g., In re Lifestyle Home Furnishings, LLC*, 2010 WL 148644, at *4 (Bankr. D. Idaho Jan. 14, 2010) & n.7 (holding that by operation of the UCC, as adopted by Idaho, due to debtor's May 7, 2007 name change a secured creditor became unperfected with respect to assets acquired on or after September 8, 2007). And if a financing statement "lapses" within the meaning of Minn. Stat. § 336.9-515(c), then the financing statement is still effective to preserve the secured creditor's priority with respect to certain creditors who acquired their interests after the filing of the financing statement but before its lapse. In particular, upon "lapse," the financing statement is still

effective to preserve the secured creditor's priority vis-à-vis a judicial lien creditor who acquired his interest after the filing of the financing statement but before its lapse. *See, e.g.*, *In re Colony Beach & Tennis Club, Inc.*, 508 B.R. at 480; *In re Miller Bros. Lumber Co., Inc.*, 2013 WL 5755052, at *7; *In re Highland Constr. Mgmt. Servs.*, LP, 497 B.R. at 837. And neither of these events extinguishes the secured creditor's lien on the debtor's assets.

    <u>c.</u>    <u>Avoidance Powers of a Chapter 11 Debtor-In-Possession</u>

    Also relevant to this Court's review of the Lien Avoidance Orders is the law governing the section 544(a) avoidance powers of the debtor-in-possession. After all, in support of both its motion for partial summary judgment in the Adversary Proceeding and its objection to Ratcliff's motion for adequate protection or, in the alternative, relief from the automatic stay, RLM and the Committee argued that Ratcliff's security interest is unperfected and avoidable by RLM as debtor-in-possession. (*See* Adversary Proceeding, ECF No. 27 at 3; Bankruptcy Case, ECF Nos. 136, 137.) The bankruptcy court concluded that by operation of Minn. Stat. § 336.9-507(c) and Minn. Stat. § 336.9-515(c), Ratcliff became an unsecured creditor in September 2014. Thus, as a result, (1) he is not entitled to adequate protection payments under 11 U.S.C. § 363 or relief from the automatic stay, and (2) RLM as debtor-in-possession may exercise its section 544(a) strong-arm powers to avoid Ratcliff's lien. (*See* Lien Avoidance Orders at 20–24.) The Court therefore considers the law governing section 544(a) avoidance important to its

review of the bankruptcy court's rationale for denying Ratcliff's motion and granting the motion for partial summary judgment.

Section 544(a) of the Bankruptcy Codes provides that a chapter 11 bankruptcy trustee "shall have, as of the commencement of the case . . . the rights and powers of, or may avoid any transfer of property of the debtor of any obligation incurred by the debtor that is voidable by," among other things, "a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains . . . a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists." 11 U.S.C. § 544. In short, at the commencement of the case by operation of bankruptcy law the trustee is granted standing to use remedies that non-bankruptcy law would give a hypothetical judgment lien creditor. *See First Nat. Bank of Denver v. Turley*, 705 F.2d 1024, 1026 (8th Cir. 1983).

And 11 U.S.C. § 1107 grants a chapter 11 debtor-in-possession (here, RLM) nearly identical rights to that of a chapter 11 trustee, including the right to exercise section 544(a) lien avoidance powers. *See, e.g., In re Iowa-Missouri Realty Co., Inc.*, 86 B.R. 617, 619 (Bankr. W.D. Mo. 1988); *accord In re Eads*, 417 B.R. 728, 746 (Bankr. E.D. Tex. 2009) (noting "[a] Chapter 11 debtor has the powers of a bankruptcy trustee, including the power to avoid unperfected liens pursuant to 544(a)(1) of the Bankruptcy Code" (citation omitted)). State law determines the scope of the debtor-in-possession's rights as hypothetical judgment lien creditor. *See In re Klingbeil*, 119 B.R. 178, 184 (Bankr. D. Minn. 1990); *see also, e.g., First*

*Nat. Bank of Denver*, 705 F.2d at 1026–27 (analyzing reach of section 544(a) strong-arm powers under applicable state law).

There is no dispute that the applicable non-bankruptcy law here is the UCC as adopted by Minnesota. Consistent with section 544 of the Bankruptcy Code, Minn. Stat. § 336.9-102(a)(52) defines "lien creditor" to include "a trustee in bankruptcy from the date of the filing of the petition." Minn. Stat. § 336.9-102(a)(52). And, as noted above, Minn. Stat. § 336.9-317(a) provides that "a person that becomes a lien creditor before" a security interest is perfected takes priority over that security interest. Minn. Stat. § 336.9-317(a). As a result, whoever is first-in-time (the creditor to perfect his security interest or the debtor-in-possession to petition for bankruptcy) takes priority over the other. If the debtor-in-possession as hypothetical judgment lien creditor takes priority over the secured creditor who does not perfect his security interest before commencement of chapter 11 proceedings, then the debtor-in-possession may avoid that creditor's security interest by exercising its section 544(a) strong-arm powers. *See, e.g.*, *In re Kinderknecht*, 308 B.R. 71, 76–77 (B.A.P. 10th Cir. 2004) (concluding creditor did not perfect its interests in the debtor's property prior to bankruptcy petition date and therefore its interests were subject to avoidance as against the trustee as hypothetical lien creditor). But if the secured creditor perfects his security interest before the petition date, then his interests are not avoidable by the debtor-in-possession under section 544(a). *See, e.g., In re Colony Beach &*

*Tennis Club, Inc.*, 508 B.R. at 479–80; *In re Miller Bros. Lumber Co., Inc.*, 2013 WL 5755052, at *7; *In re Highland Constr. Mgmt. Servs., LP*, 497 B.R. at 837–38.

3.       *Applying Relevant Law to Assess Likelihood of Success on the Merits*

The outcome-determinative issue in Ratcliff's appeals is whether Ratcliff perfected his security interests in RLM's assets before RLM filed its chapter 11 petition in September 2019. The Court concludes that Ratcliff has made the required showing that he has and that he is likely to succeed in appealing the bankruptcy court's determination that his security interests are avoidable under section 544(a) and that he is an unsecured creditor.

There is no dispute that Ratcliff's 2010 UCC-1 Financing Statement properly perfected his security interests until UMC's May 6, 2014 name change made it "seriously misleading" within the meaning of Minn. Stat. § 336.9-507(c).[5] There is also no dispute that Ratcliff failed to amend his 2010 UCC-1 Financing Statement to reflect the name change before the four-month Minn. Stat. § 336.9-507(c) safe harbor expired in September 2014. As a result, Ratcliff became unperfected in assets acquired by RLM on or after September 7, 2014. But his 2010 UCC-1 Financing Statement was still effective to perfect his interests in assets acquired before that date. Under the UCC, Ratcliff's 2010 UCC-1 Financing Statement was set to expire in 2015. But Ratcliff timely filed a UCC-complaint continuation statement in the six-month window required by Minn. Stat. Ann. § 336.9-

---

[5] Nor is there any dispute that, because the 2010 UCC-1 Financing Statement listed UMC as the debtor, it became "seriously misleading" under Minn. Stat. § 336.9-507(c).

515(d). Ratcliff therefore extended the life of his 2010 UCC-1 Financing Statement for another five years, and it continued to be effective for the limited purpose of preserving his priority in assets RLM acquired before September 7, 2014.

In January 2019, Ratcliff amended his 2010 UCC-1 Financing Statement to correct the name of the debtor to "Rancher's Legacy Meat Co." In so doing, he perfected his interests in at least some of the assets RLM acquired on or after September 7, 2014. As Ratcliff himself concedes, the gap in perfection between September 7, 2014 and January 2019 made him vulnerable to other creditors with respect to assets RLM acquired during that gap. Specifically, his briefing in support of his adequate protection motion identifies two secured creditors who perfected their interests during that gap, and he suggests they may have priority over him with respect to certain of RLM's assets. (*See* Bankruptcy Case, ECF No. 124 at 10, 14.) But for purposes of assessing Ratcliff's likelihood of success in appealing the Lien Avoidance Orders, it is enough for the Court to note that Ratcliff was perfected in at least some of RLM's assets as of the petition date.

As a result, because Ratcliff perfected his security interests in certain of RLM's assets before the commencement of RLM's chapter 11 proceedings, Ratcliff has priority with respect to those assets and his security interest in them is not avoidable by RLM. Ratcliff is therefore likely to succeed in his appeals of the bankruptcy court's determination that he is an unsecured creditor for purposes of RLM's bankruptcy

proceedings. The first factor, likelihood of success on the merits, weighs in favor of granting Ratcliff's request to stay the Lien Avoidance Orders and the related judgment.

In the Court's view, Ratcliff has also shown that he is likely to succeed on his appeal of the bankruptcy court's determination that he is not entitled to credit bid. If Ratcliff succeeds in showing that RLM cannot avoid his lien in RLM's assets, then his status as a secured creditor will no longer be in dispute. And then the basis the bankruptcy court found for finding cause under section 363(k) to deny Ratcliff the opportunity to credit bid—the genuine dispute over his secured status—disappears. The first factor thus also weighs in favor of granting Ratcliff's request to stay the Sale Order.

At this stage of the proceedings, the Court is unpersuaded by RLM and the Committee's arguments to the contrary. First, the bankruptcy court in the Lien Avoidance Orders concluded that, as a consequence of his failure to correct the name of the debtor on his financing statement within the four-month safe harbor Minn. Stat. § 336.9-507(c) provides in the event it becomes "seriously misleading," Ratcliff's 2010 UCC-1 Financing Statement lapsed in September 2014. (*See, e.g.*, Lien Avoidance Orders at 7–9.) As a threshold matter, failure to amend a financing statement within four months of the debtor's name change does not cause the financing statement to "lapse" within the meaning of the UCC. The effect of a failure to correct a "seriously misleading" financing statement within the four-month safe harbor Minn. Stat. § 336.9-507(c) provides subsequent to a name change is that the secured creditor's perfection in the asset

encumbered by his security interest is interrupted. He is perfected with respect to assets acquired before that four-month window expired and unperfected with respect to assets acquired four months after the name change. This is different from the effects of the "lapse" of a financing statement under Minn. Stat. § 336.9-515(c). Under the prospective rule, the financing statement will not preserve the secured creditor's priority as against *creditors* who acquire interests after lapse. Under the retrospective rule, the financing statement no longer preserves the secured creditor's priority as against a purchaser of the collateral value, specifically. While both Minn. Stat. § 336.9-507(c) and Minn. Stat. § 336.9-515(c) limit the effectiveness of a financing statement to perfect a secured creditor's security interest when triggered, they do so differently. And so the Court disagrees with reading the UCC to mean that Ratcliff's failure to correct  the name of the debtor on his "seriously misleading" financing statement in the four-month Minn. Stat. § 336.9-507(c) safe harbor meant that his financing statement "lapsed" under Minn. Stat. § 336.9-515(c).

Second, the bankruptcy court concluded that "under Minnesota law, once a security interest becomes unperfected, it is deemed to have never been perfected." (Lien Avoidance Orders at 8.) At this stage, this Court disagrees. As one court quipped: "When is a financing statement that is no longer effective, still effective? When it lapses, of course!" *In re Highland Constr. Mgmt. Servs., LP*, 497 B.R. at 831. As noted above, the so-called retroactive effect of lapse is that that financing statement "is deemed never to have been perfected *as against a purchaser of the collateral for value*." Minn. Stat. § 336.9-515(c)

(emphasis added); *see also, e.g., In re Colony Beach & Tennis Club, Inc.*, 508 B.R. at 479. A lapsed financing statement is still effective to maintain the secured creditor's priority with respect to other creditors who acquired their interests after filing and prior to lapse, including judicial lien creditors. *See, e.g., In re Colony Beach & Tennis Club, Inc.*, 508 B.R. at 479–80; *In re Miller Bros. Lumber Co., Inc.*, 2013 WL 5755052, at *7; *In re Highland Constr. Mgmt. Servs., LP*, 497 B.R. at 837–38.

And, to be clear, the retrospective effect of lapse (and therefore the effect of the "deemed never to have been perfected" language) is not implicated here at all. On the record before the Court there is no indication that any competing creditor obtained an interest in assets encumbered by Ratcliff's security interest after he filed his 2010 UCC-1 Financing Statement and before it would have lapsed in 2015. Instead, Ratcliff is competing with creditors who obtained interests in assets encumbered by his security interest *after* the initial five-year period of effectiveness would have expired in 2015; namely, the debtor-in-possession as hypothetical judgment lien creditor and possibly the two secured creditors he suggests perfected their interests after September 7, 2014. Thus, if his 2010 UCC-1 Financing Statement had lapsed, the inquiry would focus on application of the prospective rule.

Third, the bankruptcy court determined that "even if the Financing Statement could somehow be considered valid, the subsequent filings did not follow the requirements of the UCC and were ineffective." (Lien Avoidance Orders at 14; 15.) This

seems to result from its conclusion that providing UMC as the name of the debtor on the 2015 UCC-3 Continuation Statement made that document "seriously misleading" and therefore ineffective to extend the life of Ratcliff's 2010 UCC-1 Financing Statement. At this point of the litigation, the Court sees little reason to conclude that a continuation statement that provides the wrong name for the debtor does not comply with the UCC. Minn. Stat. § 336.9-506 explains that failure to provide the correct name of the debtor on a financing statement renders that financing statement "seriously misleading" and Minn. Stat. § 336.9-507 explains the consequences of becoming "seriously misleading" on the effectiveness of a financing statement. But the parties point to no similar statutory provisions discussing whether and how a continuation statement becomes "seriously misleading." They also point to no requirement in the UCC that a continuation statement provide the correct name of the debtor in order to be effective.

The Court's review of relevant case law revealed that, while at least one court addressing a prior version of the UCC has imported the "seriously misleading" requirement for financing statements into its assessment of the effectiveness of a continuation statement, it did so acknowledging that the UCC was "silent about such a requirement." In re Cohutta Mills, Inc., 108 B.R. 815, 822 (N.D. Ga. 1989). This Court is wary of requiring continuation statements to contain the correct name of the debtor to be effective if the plain text of the UCC contains no such requirement.

The Court's assessment of likelihood of success on the merits is, of course, not its final say on these matters. This Court acknowledges that "any court considering this factor—the 'likelihood of success on the merits'—on a motion to stay runs the risk of appearing presumptuous in its assessment of the strength of its analysis in its order." *Brady v. Nat'l Football League*, 779 F. Supp. 2d 1043, 1053 (D. Minn. 2011). The Court is open to being persuaded by RML and the Committee when full briefing and argument on the merits has concluded. *See Iowa Utilities Bd.* at 425.

**B.      *Irreparable Injury to Movant***

Ratcliff argues that he will suffer irreparable harm from the sale of RLM's assets before his secured status is determined on appeal because the sale would moot his appeals. He further argues that holding sales proceeds in escrow is not sufficient to mitigate his harm because as a secured creditor he would be entitled to credit bid to ensure that his collateral will not be sold at a depressed price. If the section 363 sale proceeds, then section 363(m) of the Bankruptcy Code will "prevent[] a modification or reversal of a bankruptcy court's order authorizing the sale of the debtor's assets from affecting the validity of the sale." *In re Trism, Inc.*, 328 F.3d 1003, 1006 (8th Cir. 2003). Thus, even he succeeds on his appeals—and the Court concludes that he is likely to do so— then Ratcliff will not be able to protect collateral that is encumbered by his security interests from being sold at a depressed price. The Court therefore concludes that Ratcliff has shown he will suffer irreparable injury if this Court does not stay the Lien Avoidance

Orders and the Sale Order and the second factor weighs in favor of granting Ratcliff's requested stay.

### C.    *Substantive Harm to Other Parties*

Ratcliff argues that delaying the sale until Ratcliff's status is confirmed will in fact increase the value of the company and potentially bring more of a return to the creditors of the company and thus the other parties in interest will suffer no harm if this Court grants his requested stay. This Court disagrees. So long as Ratcliff pursues litigation in search of a final, non-appealable order, RLM's estate will lose cash, to the detriment of RLM's creditors. This factor thus weighs against granting Ratcliff's requested stay.

### D.    *Public Interest*

Ratcliff contends that the final factor weighs in his favor because there is a strong public interest in giving a secured creditor the benefit of his bargain. Again, the Court disagrees. There is also a strong public interest in maximizing the value of the bankruptcy estate. *See Lithograph Legends, LLC v. U.S. Tr.*, No. 09-CV-943JMR, 2009 WL 1209469, at *5 (D. Minn. Apr. 30, 2009). As noted above, putting off a section 363 sale so long as Ratcliff's rights to credit bid are determined by a final, non-appealable order will cause the estate to suffer administrative burn at the expense of the estate and its creditors. Weighing the public interest in maximizing the value of the bankruptcy estate against the public

interest (if any) in giving a secured creditor the benefit of this bargain, this factor is at best neutral. It thus does not weigh in favor of granting Ratcliff's requested stay.

### E.    *Weighing the Factors*

Having considered all of the relevant factors, the Court concludes that the factors weigh in favor of granting Ratcliff's request to stay the Lien Avoidance and Sale Order so long as his appeals of those orders remain pending.

### F.    *Supersedeas Bond*

The Court next addresses whether Ratcliff should be required to post a bond. It is within the Court's discretion to require a bond for a stay pending appeal. *See In re Revel AC, Inc.*, No. 14-22654 GMB, 2015 WL 567015, at *6 (D.N.J. Feb. 10, 2015); *see also* Fed. R. Bankr. P. 8007(c) ("The district court . . . may condition relief on filing a bond or other security with the bankruptcy court."). "The purpose of requiring a bond . . . is to indemnify the party prevailing in the original action against loss caused by an unsuccessful attempt to reverse the holding of the bankruptcy court." *In re Motors Liquidation Co.*, 539 B.R. 676, 686 (Bankr. S.D.N.Y. 2015) (citing *In re Tribune Media Co.*, 799 F.3d 272, 281 (3d Cir. 2015)). "There is in general a strong policy against granting stays without providing some security to the adverse party." *In re Gleasman*, 111 B.R. 595, 602 (Bankr. W.D. Tex. 1990). And the form and amount of that security are generally also within the discretion of the court deciding the motion for stay pending appeal. *See, e.g., id.* If the party-in-interest seeking stay pending appeal requests a stay without bond, "the

applicant has the burden of demonstrating why a court should deviate from the ordinary full security requirement." *In re Motors Liquidation Co.*, 539 B.R. at 686 (citation omitted).

Here, RLM and the Committee argue that any stay pending appeal should be conditioned on Ratcliff posting a bond in an amount less than $6 million. They point out that "[t]here is no dispute that absent a stay, [RLM's] assets will sell for a current minimum price of $5,080,000.00." (ECF No. 29 at 31.) They also contend that postponing the sale of RLM's assets will impose additional costs and expenses as RLM attempts to restart a sales process at a later date. (*See id.* at 3.) Ratcliff argues that he should not be required to post a bond because "no harm will come to [RLM] by the stay" and, in any event, if the sale "goes away" RLM can always liquidate its assets so Ratcliff should only be required to post a bond for the difference between the minimum price and RLM's liquidation value. (ECF No. 14 at 39–40.).

The Court finds that Ratcliff falls far short of showing why the Court should deviate from the standard practice of requiring Ratcliff, the losing party below, to post a bond in order to protect RLM and the Committee from the losses they may suffer if Ratcliff is unsuccessful in his appeals. Among other things courts consider in this context is the opportunity cost to the prevailing party below. *See, e.g.*, *In re Motors Liquidation Co.*, 539 B.R. at 687; *In re Tribune Media Co.*, 799 F.3d at 282. Here, the opportunity cost to the estate and its other creditors is substantial: having spent considerable time and effort finding a stalking horse bidder, establishing a sales process, and seeking the bankruptcy

court's approval of its proposed sale and bidding procedures, the debtor-in-possession may have to start anew the entire process at a later date. At this time, they can only speculate that they may be successful in doing so. And, although Ratcliff has demonstrated some measure of irreparable harm, the risk of him suffering that harm is far eclipsed by the risk to RLM and the Committee if he is unsuccessful. And the Court disagrees that the difference between the minimum price and RLM's liquidation value properly accounts for the loss RLM and its other creditors may suffer. Ratcliff's cold calculations fail to account for the difference to RLM and its other creditors between maintaining RLM as a going concern and scrapping it for parts. Thus, the Court determines that Ratcliff must post a bond of $6 million to obtain his requested stay pending appeal of the Lien Avoidance Orders and Sale Order.

### III.    Emergency Motion for the Consolidation and Acceleration of Appeals

### A.    *Consolidation*

Ratcliff also requests that this Court consolidate his appeals because the issues implicated in all three of his appeals are closely related. This Court agrees; among other things, as noted above, deciding whether Ratcliff's lien is avoidable under section 544(a) appears integral to this Court's review of the Lien Avoidance Orders and Sale Order. Indeed, in this opinion the Court cites to the Lien Avoidance Orders even though they were entered on two different dockets—the underlying bankruptcy case and the adversary proceeding initiated against Ratcliff—because the bankruptcy court entered

the same order on both dockets. The attorneys in these cases are also the same. Finally, consolidation will cause no unfair prejudice to any party. In these circumstances, consolidation of Ratcliff's three appeals from the bankruptcy court is appropriate. *See, e.g.*, *Briggs v. Rendlen*, No. 4:18-CV-1440-JAR, 2018 WL 4502182, at *2 (E.D. Mo. Sept. 19, 2018).

**B.   *Acceleration of Appeals***

Ratcliff also requests that this Court expedite his appeals. The Court understands that Ratcliff seeks to expedite his appeals as an alternative to a stay pending appeal. (*See* ECF No. 24 at 7–8 ("If a stay pending appeal is not issued in these cases . . . the only meaningful chance for Ratcliff to obtain relief in the appeals will be to have the hearing and the court reach a decision prior to" the final sale hearing.) The Court has determined that the relevant factors weigh in favor of a stay pending appeal. It finds no cause to expedite.

**CONCLUSION**

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Ratcliff's Motion for Stay Pending Appeal (*James L. Ratcliff, et al. v. Rancher's Legacy Meat Co., et al.*, Case No. 20-CV-834 (D. Minn.) ECF No. 24; *James L. Ratcliff, et al. v. Rancher's Legacy Meat Co., et al.*, Case No. 20-CV-835 (D. Minn.) ECF No. 23; and *James L. Ratcliff v. Rancher's et al.*, 20-CV-1343 (D. Minn.) ECF No. 12) is GRANTED contingent upon Ratcliff posting a supersedeas bond in the amount of $6,000,000.00 within two days of the date of this opinion unless the parties come to a different agreement. Counsel for Ratcliff shall immediately notify counsel for

RLM and for the Committee upon the posting of the bond and certify the same to this Court.

a.   So long as Ratcliff posts a supersedeas bond that is consistent with this Order, the Lien Avoidance Orders, the Sale Order, and any related judgments are stayed until further order of this Court.

2. Ratcliff's Emergency Motion for Consolidation and Acceleration of Appeals (*James L. Ratcliff v. Rancher's et al.*, 20-CV-1343 (D. Minn.) ECF No. 22) be GRANTED IN PART AND DENIED IN PART.

3. The appeals in *James L. Ratcliff, et al. v. Rancher's Legacy Meat Co., et al.*, Case No. 20-CV-834 (D. Minn.); *James L. Ratcliff, et al. v. Rancher's Legacy Meat Co., et al.*, Case No. 20-CV-835 (D. Minn.); and *James L. Ratcliff v. Rancher's et al.*, 20-CV-1343 (D. Minn.) be consolidated and jointly administered for purposes of oral argument.

Dated: July 20, 2020                              BY THE COURT:

                                                  s/Nancy E. Brasel
                                                  Nancy E. Brasel
                                                  United States District Judge

41